Alexina NECHIS and Doris Mady, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

OXFORD HEALTH PLANS, INC., and Triad Healthcare, Inc., Defendants.

No. 03 CIV 7393(CM).

United States District Court, S.D. New York.

Aug. 4, 2004.

470

Catherine E. Anderson, Giskan & Solotaroff, New York City, for Plaintiffs.

Karen M. Wahle, O'Melveny & Myers L.L.P., New York City, Mark S– Baldwin, Brown, Rudnick, Freed & Gesmer, P.C., Hartford, CT, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

MCMAHON, District Judge.

Plaintiffs Alexina Nechis and Doris Mady, both New York citizens, bring this action on behalf of themselves and as a class action pursuant to Fed.R.Civ.P. 23(b)(2) and 23(b)(3) against Defendants Oxford Health Plans, Inc. ("Oxford") and Triad Healthcare, Inc. ("Triad"). They allege that (1) Oxford breached its disclosure obligations under ERISA, 29 U.S.C. §§ 1021, 1022, 1024(b), et seq.; (2) Oxford and Triad breached their fiduciary duties under ERISA, 29 U.S.C. § 1104(a)(1); (3) Oxford failed to provide benefits due under Plaintiffs' health insurance plans in accordance with ERISA, 29 U.S.C. § 1132(a)(1); and (4) Oxford was unjustly enriched under ERISA, 29 U.S.C. § 1132(a)(3). Plaintiffs claim to have exhausted their administrative remedies in accordance with ERISA, 29 U.S.C. § 1132(2), and so to be entitled to apply to this Court for the relief they seek.

Defendant Oxford moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Defendant Triad moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, or in the alternative moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for the same reasons stated above.

For the reasons stated below, both defendants' motions to dismiss are GRANTED.

## FACTS

### The Defendants

Oxford is a public health care company, incorporated in Delaware, that maintains its corporate headquarters in Trumbull, Connecticut. Oxford provides health benefit plans primarily in New York, New Jersey and Connecticut. Triad is a nationwide Chiropractic Managed Care Organization, with its principal office located in Plainville, Connecticut.

Oxford is in the business of underwriting, administering, and operating employee welfare plans. Employee welfare plans are defined in 29 U.S.C. § 1002(1) as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization,...for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits."

Oxford's product line of health benefit plans includes health maintenance organization ("HMO") plans, point-of-service ("POS") plans, and preferred provider ("PPO") plans offered to groups, individuals, and medicare beneficiaries. Oxford's product line also includes third-party administration of employer-funded benefit plans.

Oxford's HMO plans provide comprehensive health care benefits through Ox-

ford's participating network of providers. The HMO plans are designed to offer cost-efficient health care coverage. Under most of Oxford's HMO plans, members are required to select a primary care physician ("PCP") who is responsible for certain preventative and primary medical services. In order to receive insurance coverage for seeing a participating medical specialist, HMO members must typically receive a referral from their PCP.

Oxford's POS plans, primarily marketed under the names "Freedom Plan" and "Liberty Plan" combine the benefits of Oxford's HMO plans and their indemnity health insurance by covering services provide by non-participating providers. These plans give members the option of accessing HMO-style benefits through participating providers or of accessing indemnity-style benefits with the commensurate variation in member cost-sharing.

Oxford's PPO plans allow members to obtain coverage for service from participating providers or from non-participating providers. Generally, PPO plans do not require that PCP referrals be obtained in order for the member to see a specialist. Under a PPO plan services rendered by participating providers are subject to lower member cost sharing than are services obtained from non-participating providers.

Oxford offers its products through its HMO subsidiaries: Oxford Health Plans (N.Y.), Inc., Oxford Health Plans (NJ), Inc., Oxford Health Plans (CT), Inc., and MedSpan Health Options, Inc. as well as through its insurance subsidiaries, Oxford Health Insurance, Inc. and Investors Guaranty Life Insurance Company.

Oxford provides its subscribers with a description of the benefits provided by their health insurance plans. Each of the HMO, PPO, and PSO plans includes coverage for chiropractic care that is deemed "medically necessary." "Medically necessary" is defined in Oxford's insurance poli-cy guides as "Services...provided by a...Physician or other provider required to identify or treat your illness or injury and which, as determined by Our Medical Director, are: 1. Consistent with the symptoms or diagnosis and treatment of your condition, 2. Appropriate with regard to standards of good medical practice, 3. Not solely for your convenience or that of any provider; and 4. The most appropriate supply or level of service which can safely be provided." On its website, Oxford states that "the number of [chiropractic] treatments you need depends on your particular problem, how long you've had it, and how severe it is. Most problems will take about 6 to 12 weeks of treatment."

**Chiropractic Coverage Under Plaintiffs' Policies**

In December 2002, Oxford retained Triad to review claims for chiropractic coverage. At some point in the spring of 2003 Oxford distributed a brochure entitled "Healthy Mind, Healthy Body." The brochure informed Oxford subscribers that their in-network chiropractors would now be required to submit treatment plans for prior approval from Triad before chiropractic services could be rendered. In the same brochure, Oxford stated that submission of a treatment plan from out-of-network chiropractors for pre-approval was optional, not required. However, with respect to all post-service determinations, the brochure stated, "when claims are submitted after your services have been rendered, we will need to review clinical notes, patient records, or other similar documentation in order to make coverage decisions."

After retaining Triad to review chiropractic claims, Oxford maintained that all coverage decisions would continue to be made on the basis of medical necessity.

Plaintiff Nechis is a resident of New Rochelle, NY. She is employed by Mount

Vernon Hospital. Health care coverage is part of Nechis' union benefits package. Nechis' Oxford plan provided her with unlimited chiropractic coverage for in-network care and coverage for fifteen visits to out-of-network chiropractors, based on medical necessity.

In January of 2003, Nechis began receiving out-of-network chiropractic care for severe neck pain and numbness in her arms. Although not required to do so, Nechis' out-of-network chiropractor submitted a treatment plan to Oxford and Triad for pre-approval, and Oxford and/or Triad granted pre-approval of Nechis' treatment plan. Nonetheless, Nechis alleges that Oxford and/or Triad denied coverage for most of Nechis' out-of-network visits. Nechis claims that coverage was denied for her initial diagnostic visit because it was deemed not medically necessary. Nechis also claims that Oxford and Triad have disputed the treatment codes that her chiropractor submitted and have denied receiving documentation substantiating the necessity of care. As a result, Nechis has paid more than $2,000 for her chiropractic treatment but has been reimbursed for only $600 of this amount.

Nechis alleges that in the months after her coverage benefits were initially denied, both she and her chiropractor made numerous attempts to contact Oxford and Triad—via telephone, fax, and mail—and have received no satisfactory response. Therefore, Nechis claims that she has exhausted her administrative remedies and has brought this suit.

Plaintiff Mady became a member of Oxford's Freedom Plan in April 1997, while she was employed at Langworth Pantel Group, Inc. Mady's premiums were paid by her employer until March 2002, when her job was eliminated in a downsizing. At that time, Mady elected to continue her Oxford health care coverage through the COBRA policy and paid $276.44 per month for the next 18 months. Switching to coverage via the COBRA policy did not alter the terms and conditions of Mady's plan. Mady's plan allowed her unlimited in-network chiropractic care, as well as coverage for a maximum of $500 per year in out-of-network care.

In November of 2002, Mady sought chiropractic care from an out-of-network provider. Mady had previously been treated by the same out-of-network chiropractor and had no trouble receiving coverage. However, Mady alleges that she has not been reimbursed for any out-of-network chiropractic care since Oxford retained Triad in January 2003.

Mady claims that she has attempted to remedy her claims disputes in accordance with the administrative remedies provided by Oxford. Mady alleges that she has written letters and placed telephone calls to Oxford, appealing the denial of her benefits. She contends that she was directed to contact Marc Peyser, DC to discuss her disputed claims, but when she called the number provided, there was no Marc Peyser at that location. On May 22, 2003, Mady was informed that her files were being turned over for review. On July 23, 2003, Oxford wrote to Mady informing her that her grievance had been submitted to Oxford's Correspondence Appeals Department for first level review.

Oxford's rules require that Oxford respond to appeals for denied claims submitted for first level review within thirty days of receipt. After waiting sixty days, but receiving no response from Oxford, Mady commenced this action.

## DISCUSSION

### I. Standard of Review

 Dismissal of a complaint for failure to state a claim on which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6)

is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The test is not whether the plaintiff is ultimately likely to prevail, but whether he is entitled to offer evidence to support his claims. *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). The court assumes that all factual allegations are true, and draws all reasonable inferences in Plaintiff's favor. *EEOC v. Staten Island Sav. Bank,* 207 F.3d 144 (2d Cir.2000). While the court must accept material allegations in a complaint as true, however, the court need not accept conclusory allegations. *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660 (2d Cir.1996) (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991)).

## II. Exhaustion of Administrative Remedies

■ Plaintiffs allege that they have exhausted Oxford's administrative remedies for resolving claims disputes and thus have standing to bring this lawsuit. It is, of course, well settled ". . . .that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d 588 (2d. Cir.1993) (quoting *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938)).

In the present case, there is some dispute as to whether Plaintiffs have, in fact, exhausted their administrative remedies.

Oxford provide a three step process for group members to appeal an adverse benefits determination. Members must first file a grievance by calling a Member Service Associate or writing a letter to the Issues Resolution Department. The Issues Resolution Department will acknowledge receipt of a grievance within fifteen days and issue a determination within thirty days of receiving all pertinent information. If the member remains dissatisfied, the determination can be appealed by refiling the grievance with the Grievance Review Board. If the member is still dissatisfied after receiving the decision of the Grievance Review Board, he or she can move to the last step of the grievance process by appealing to the Board of Directors' Committee.

The complaint contains no allegation that Plaintiff Nechis ever attempted to appeal her benefits decision in accordance with Oxford's grievance policy. Nechis only asserts that she called and wrote letters to Oxford. She does not say to whom she spoke or directed her correspondence. The pleading offers no indication that Nechis followed the proper procedure for filing a grievance of her benefits decision.

■ Plaintiff Mady, on the other hand, at least attempted to comply with Oxford's grievance procedure in appealing her claim. Mady filed a formal grievance, which Oxford acknowledged receiving. Although Mady was informed that her grievance was being turned over for first level review, she did not receive a decision within thirty days, as required by the company's procedure. Oxford does not dispute any of this in its Motion to Dismiss—which may be why only Triad, not Oxford, has moved to dismiss on exhaustion grounds.

Mady has attempted to comply with the grievance procedure. She is not required to wait indefinitely for a response to her

grievance, which is necessary before she can go on to the next step (an appeal). Therefore, the fact that she has not completed each step in the grievance process is immaterial. She has demonstrated futility and will be deemed to have exhausted her administrative remedies.

Ordinarily, I would dismiss Nechis's claims without prejudice, so she could go through the administrative grievance procedure (or amend her complaint to demonstrate that she did in fact grieve through appropriate channels). However, after reviewing Mady's claims (which are identical to the claims asserted by Nechis), I conclude that all of them must be dismissed for failure to state a claim. Because it would be futile for Nechis to go through the grievance procedure only to assert claims that must be dismissed as a matter of law, I will dismiss her claims with prejudice.

### III. None of Mady's Claims Is Legally Cognizable

#### A. Count One

The complaint alleges that Oxford, as an ERISA fiduciary, breached its disclosure obligations under sections 102 and 104 of ERISA, 29 U.S.C. §§ 1021, 1022, 1024(b), et seq. Specifically, it claims that Oxford failed to disclose the following to Plaintiffs:

a. Oxford does not base its decisions concerning chiropractic coverage solely, if at all, on medical necessity. Instead, Oxford employs undisclosed cost-based criteria and other means to determine whether coverage for chiropractic care will be provided, as well as the extent and type of coverage for chiropractic care will be provided, as well as the extent and type of coverage, if any;

b. Oxford provides financial incentives to Triad to deny chiropractic claims and to limit the extent and type of coverage, if any, for chiropractic claims without regard to medical necessity; and

c. Oxford has intentionally and unreasonably delayed payment of covered claims for chiropractic care to subscribers and their chiropractors so that Oxford may earn greater interest on premiums paid by subscribers and/or their employers for their Oxford health care policies.

The complaint alleges that Oxford's failure to make these disclosures violates section 104(b) of ERISA which requires that notification be given within 60 days of the effective date of any material reduction in benefits or services.

This claim fails because Oxford had no such disclosure obligation—as the papers filed in opposition to the motion to dismiss concede.

The express disclosure obligations found in Part 1 of Title I of ERISA, *see* ERISA §§ 101–111, 29 U.S.C. 1021–1031, are imposed only on a plan's "administrator" and only on the "plan administrator." ERISA defines the "administrator" of a plan as follows:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may be regulation prescribe.

29 U.S.C. § 1002(16)(A). ERISA defines "plan sponsor" as "the employer in the case of an employee benefit plan established or maintained by a single employer." 29 U.S.C. § 1002(16)(B)(i).

██ Under this definition, Oxford is not the plan administrator. Footnote 13 of Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss states, "Oxford does not designate a Plan Administra-

tor in its Certificates of Coverage, or identify the plan administrator with respect to plaintiffs' plans." That being so, Oxford does fall within the parameters of subdivision (i). Oxford is not Mady's employer, and so is not the "plan sponsor" under subdivision (ii)—Langworth Pantel Group is. Plaintiff acknowledges as much in the same footnote, where she states, "ERISA provides that when a Plan Administrator is not so designated, the employer is the default plan administrator."

### B. Count Two

The complaint next alleges that Oxford and Triad breached their fiduciary duty and that Plaintiffs are therefore entitled to relief under ERISA § 502(a)(2) and § 502(a)(3). This claim, too, must be dismissed.

■■ With respect to the § 502(a)(2) cause of action, the complaint alleges that Defendants breached their ERISA § 409 fiduciary obligations in connection with administering the Oxford Benefits. However, a § 502(a)(2) claim must "be brought in a representative capacity on behalf of the plan as a whole." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n. 9, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). In this case, Mady is not suing on behalf of the plan (i.e., to recover plan assets). Rather, she has commenced a class action—which is not at all the same thing as a representative action—and she seeks, on behalf of herself and unnamed others, to recover benefits to which the class members believe they are individually entitled. *See Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993) (citing *Russell* and dismissing a § 502(a)(2) claim "because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan."). *See also Mead v. Arthur Andersen, LLP*, 309 F.Supp.2d 596 (S.D.N.Y.2004). The complaint's factual allegations focus on harm suffered by the putative class members, in that the value of their health coverage was diminished by virtue of Oxford/Triad's failure to reimburse them for the contractually-mandated level of chiropractic care. This alleged harm can only be redressed by awarding relief to those individual plaintiffs who have suffered a reduction of their benefits. Nowhere in their complaint do Plaintiffs allege a loss of plan assets.

Because she fails to allege injury to the plan, as opposed to herself and other class members, Mady has failed to plead a viable § 502(a)(2) claim. *See AMA v. United HealthCare Corp.*, Nos. 00 CIV. 2800(LMM), 00 CIV. 7246(LMM), 2001 WL 863561, at *21 (S.D.N.Y. July 31, 2001) (quoting *Russell* "A fair contextual reading of [§ 409] makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.").

As for § 502(a)(3), it authorizes a civil action "to enjoin any act or practice which violates...the terms of the plan, or...to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). The Supreme Court has held that "equitable relief in § 502(a)(3) must refer to those categories of relief that were typically available in equity." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). The Supreme Court went on to say that "[a]lmost invariably...suits seeking...to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages.'" *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)). And "money damages are, of course, the classic

form of legal relief." *Mertens,* supra, at 255, 113 S.Ct. 2063.

 In *Great–West,* the Supreme Court did, however, acknowledge that a sum of money might constitute "appropriate equitable relief" in very limited circumstances. The Court distinguished between equitable restitution that may appropriately be awarded under § 502(a)(3) and legal restitution, that may not. To qualify as "equitable relief" under § 502(a)(3), a demand for restitution must seek "a constructive trust or an equitable lien, where money or property identified as belonging in conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great–West,* at 213, 122 S.Ct. 708. At the same time, the Court specifically rejected contract-based remedies as constituting proper equitable relief. *Great–West,* at 210, 122 S.Ct. 708. ("Here, petitioners seek, in essence, to impose personal liability on respondents for a contractual obligation to pay money—relief that was not typically available in equity. A claim for money due and owing under a contract is 'quintessentially an action at law.' ") (citations omitted).

 In the present case, the complaint prays for monetary relief that does not qualify as "equitable" under any interpretation of § 502(a)(3). The pleadings ask for "damages" (Compl.¶¶ 16, 50, 80), "unjust enrichment" (Compl.¶¶ 82–85), and "disgorgement of ill-gotten gains" (Compl. Prayer for Relief). All of these terms indicate that Mady and the class she purports to represent want contract-based damages in an amount they claim they overpaid for their health care coverage. This sort of relief is not available under § 502(a)(3).

 The complaint does ask for restitution, which is a traditional equitable remedy. But for Mady's restitution claim to be considered "equitable," the money sought must "clearly be traced to particular funds or property in the defendant's possession." *Great–West,* at 213, 122 S.Ct. 708. The complaint here does not meet this standard. The funds upon which they seek to impose a "constructive trust" are merely premiums paid for health care coverage, which Oxford is not obligated to segregate and which are not alleged to exist in a separately identifiable account.

In a similar case, this court previously held that a claim for equitable restitution cannot be stated under § 502(a)(3)—even if money has changed hands between plaintiffs and defendants—where it can "no longer be traced to a particular fund." *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 375 (S.D.N.Y.2002). There is no meaningful difference between the facts alleged here and those in *Neidich.* Accordingly, Plaintiff's § 502(a)(3) claim is dismissed.

### C. Count Three

 In the third count, the complaint alleges that Mady and the members of the class are entitled to recover benefits due to them under the terms of their Oxford Health Plans pursuant to § 502(a)(1)(B) of ERISA. It asserts:

> Oxford provided chiropractic coverage different from that described by Oxford in the summary plans and other documents distributed to Plaintiffs. Plaintiffs...purchased an ERISA-governed benefit of coverage for medically necessary chiropractic care as described and defined in the Oxford health policies. Oxford consistently did not provide this type of chiropractic coverage.

(Compl.¶ 79). Therefore, the pleading prays for "recovery of past coverage benefits in an amount...equal to the difference between the value of the coverage benefit purchased and the value of the coverage benefit actually provided." (Compl.¶ 81).

■ Plaintiff cannot bring this claim under § 502(a)(1)(B). That provision of ERISA authorizes a participant or beneficiary to bring a claim only "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Under § 502(a)(1)(B), "[t]he relief expressly provided is to secure benefits under the plan, rather than damages for a breach of the plan." *Turner v. Fallon Cmty. Health Plan, Inc.*, 127 F.3d 196, 198 (1st Cir.1997). Yet here, named plaintiff and the proposed class seek what can only be characterized as damages for breach of the plan—recovery of money based on the purported diminished value of an employee's insurance policy. This remedy is not available under § 502(a)(1)(B).

Other courts that have addressed this very issue have determined that plaintiffs claiming a diminished value theory of recovery cannot proceed under § 502(a)(1)(B):

> Count III alleges a denial of coverage-benefits under 502(a)(1)(b). Under established law such claims typically arise only when benefits are requested and formally denied. *See Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72 (4th Cir.1989). In *Rodriguez*, the Fourth Circuit Court of Appeals wrote that tethering a claim to a specific denial avoids "burdening the judicial system with multiple and premature actions." There is, therefore, no precedent under the section § 502(a)(1)(B) case law for the plaintiffs' market value theory of recovery.

*Doe v. Blue Cross Blue Shield, of Md., Inc.*, 173 F.Supp.2d 398, 407 (D.Md. Sept.28, 2001).

■ Mady tries to distinguish her claim from that of the plaintiffs in *Doe* by arguing that the class here has, in fact, suffered an actual injury—the denial of benefits for their chiropractic treatment. But that is not the relief the complaint seeks. Moreover, Mady purports to sue on behalf of a class, but claims for benefits due but not paid are too individualized to be the subject of a class action. *See Miner v. Empire Blue Cross/Blue Shield*, 2001 WL 96524 (S.D.N.Y.2001) ("Insofar as [plaintiff] seeks reimbursement under his plan for unpaid claims, he may not bring this claim as a class action. Any such claim for benefits requires an individualized assessment of each plaintiff's case."). In order to maintain a class action, Mady would have to allege some injury common to all the members of the class. The class is defined as "all persons who are or were oxford policy holders whose policy includes coverage for chiropractic care." (Compl.¶ 14.) The class-wide injury—diminution of the value of the policy—is *not* tethered to a specific denial of benefits. Thus, it cannot be the subject of a claims brought pursuant to § 502(a)(1)(B).[1]

### D. Count Four

Finally, in count four, Plaintiffs assert a claim for unjust enrichment, allegedly pursuant to § 502(a)(3). Plaintiffs allege that Oxford "provided plaintiffs and the Class with chiropractic coverage of lesser value than represented by Oxford." (Compl.¶ 83). Based upon this difference in coverage provided, Plaintiffs claim that "Oxford received unearned premium revenues from plaintiffs and the Class" and that they are entitled "to recover the amounts by which Oxford has been unjustly enriched." (Compl.¶ 83–85).

---

1. The fallacy of the "tethering" argument is that there is no indication in the complaint that all the members of the purported class were unfairly denied chiropractic benefits, or even that they even sought chiropractic treatment in the first place.

ERISA does not create any cause of action for unjust enrichment, and no such remedy may be implied under the common law. The creation of an extrastatutory federal common-law based remedy is rarely appropriate under ERISA. "[W]here Congress has established an extensive regulatory network and has expressly announced its intention to occupy the field, federal courts will not lightly create additional rights under the rubric of federal common law." *Amato v. W. Union Int'l, Inc.*, 773 F.2d 1402 (2d Cir.1985) (citation omitted) (rejecting unjust enrichment claim under ERISA).

Many courts have concluded that ERISA does not provide any remedy for "unjust enrichment." *See Morales v. Pan Am. Life Ins. Co.*, 718 F.Supp. 1297, 1301 (E.D.La.1989) ("Creation of a federal common law of unjust enrichment...would be inconsistent with ERISA's terms and policies."); *Cummings v. Briggs & Stratton Ret. Plan*, 797 F.2d 383, 390 (7th Cir.1986) ("We are particularly reluctant to fashion a federal common law doctrine of unjust enrichment when such a right would override a contractual provision in a pension plan."). In *Am. Med. Ass'n v. United Healthcare Corp.*, 2001 WL 863561 (S.D.N.Y. Oct. 23, 2002) (McKenna, J.), the court addressed allegations that defendants used improper methods for administering claims, resulting in lower than allowable benefits determinations. Rejecting an unjust enrichment claim, the court reasoned:

> Plaintiffs bring a federal common law claim for unjust enrichment alleging that United Healthcare has been unjustly enriched by its UCR determinations because it "obtained benefits that it would not have obtained had it properly determined payment for medical services rendered to subscribers by out-of-network providers." (Second Am. Compl. ¶ 136). Although courts may develop a federal common law under ERISA if appropriate, courts have uniformly held that

there is no need to supplement ERISA with a common law claim of unjust enrichment because the statute already provides adequate relief for an injury such as the losses claimed by plaintiffs. *Am. Med. Ass'n*, at \*14..

Plaintiffs do not even respond to Oxford's argument that unjust enrichment is not allowed under ERISA. It would seem that Mady realizes that the claim for unjust enrichment is not cognizable, and has abandoned it.

### CONCLUSION

For the aforementioned reasons, Defendants' motions to dismiss are GRANTED. The Clerk of the Court is directed to enter judgment for defendants and to close the file.